IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

TEASHA ROGERS,

        Plaintiff,

v.

DENISE JOHNSON, et al.,

        Defendants.

NO. C08-4395 TEH

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the court on Defendants' motion for summary judgment. Plaintiff Teasha Rogers ("Rogers" or "Plaintiff") brings federal and state claims for discrimination and sexual harassment arising from her employment with the Lake County Animal Care and Control Department ("Animal Control"). Defendants Denise Johnson ("Johnson"), Morgan Hermann ("Hermann"), and Lake County (collectively, "Defendants") move for summary judgment on all claims. After carefully considering the parties' written arguments, the Court found oral argument to be unnecessary and vacated the hearing that had been scheduled for April 26, 2010. For the reasons set forth below, Defendants' motion is GRANTED IN PART and DENIED IN PART.

**FACTUAL BACKGROUND**

Rogers was hired as an Animal Control Officer I for Lake County on September 21, 2006, for a probationary period intended to last one year. She was terminated nearly 11 months later, on August 6, 2007. Rogers had applied for the officer position while working part-time as a kennel assistant with Animal Control, a position she held since February 2006. She had previously volunteered with Animal Control as a teenager.

Johnson, the director of Animal Control, was Rogers' supervisor. Rogers trained primarily with Hermann, an Animal Control Officer III. Plaintiff is a lesbian woman and

was in a relationship with another woman, Kelly Kostka, during her employment with Animal Control. Rogers claims that both Hermann and Johnson subjected her to sexual harassment.[1]

## I. Episodes of Alleged Harassment

It is undisputed that Hermann shared stories with Rogers about sexual encounters, although the parties disagree about the content and frequency of those conversations. Hermann invited Rogers to go skydiving after telling Rogers that her husband had watched her have sex with another woman on a skydiving trip – which Rogers construed as a proposition. Rogers believes that Hermann told her such stories on at least five occasions. Although Hermann recalls mentioning the sexual encounters and extending the skydiving invitation, she denies doing so in the same conversation, and claims that she invites "everybody" to accompany her skydiving. Hermann told Rogers about having sex with a woman in a hot tub while skydiving, and described being unable to have sex one weekend because her period was too heavy. Hermann also made comments about "jumping into . . . bed naked" with Johnson and her partner. She acknowledges telling Rogers that she "likes girls," and does not recall ever telling colleagues other than Rogers about her sexual relations.

Hermann also admits that she showed Rogers a sexually suggestive photograph. Hermann posed nude – with props strategically placed to obscure private areas – for a fund-raising calendar to benefit the Clear Lake Animal Welfare Society, or C.L.A.W.S. Hermann and another employee who appeared in the calendar, Katherine Bennett, submitted the pictures for review by Johnson, who divided the photographs into appropriate and inappropriate piles, requesting that only the "appropriate" pictures be considered for

---

[1] Defendants raise evidentiary objections to more than half of the passages in Plaintiff's statement of facts. To the extent that the Court relies on evidence to which Defendants object, those objections are overruled. Defendants' dozens of hearsay objections are largely without merit: Plaintiff cites out-of-court statements not for the truth of the matters asserted, but for the fact that the statements were made. With respect to Defendants' relevancy objections, the Court relies only on evidence that it concludes is relevant.

2

publication. When Rogers was upset about a fight with her girlfriend, Hermann showed her one of the nude photos, asking, "Does this make you feel better?" Rogers replied that it did not, prompting Hermann to put the picture away. Rogers construed this as a sexual advance. Although Johnson was aware that Rogers had shown some of her photographs to other employees, she assumed only the "appropriate" pictures were shared. It is unclear which category of photograph was shown to Rogers.

Rogers alleges that Johnson, while less overtly sexual in her conduct than Hermann, also subjected her to harassment. Although Johnson never explicitly asked Rogers to have a sexual relationship with her or threatened her job for refusing to do so, Rogers repeatedly inferred that Johnson was propositioning her. Johnson asked Rogers about her relationship with Kostka the first time they rode together in a county vehicle, in response to which Rogers explained that she and her girlfriend were monogamous. Johnson told her that she cheats on her partner, and advised Rogers that cheating is "fine" as long as one's partner does not find out. On a few occasions, Johnson asked Rogers why she was still with her girlfriend, told her that she should be with someone else, and invited Rogers over to her house to talk. Johnson commented that Rogers should be with someone who treats her better, which Rogers construed as an insinuation that Rogers and Johnson should enter a relationship. Finally, Rogers claims that Johnson told her she "dresses really good" when she was applying for the officer position, which made her uncomfortable.

Johnson denies many of Rogers' allegations, and contends that Rogers misconstrued those episodes that did occur. The invitation to her house had no sexual overtones because Johnson tells all of her staff that they are welcome at her home anytime. Johnson asserts that she never broached the topic of Rogers' girlfriend herself, but would only ask about the relationship when Rogers was upset about an argument with Kostka. Johnson denies ever cheating on her partner or advising Rogers about the propriety of doing so.

On only one occasion does Rogers allege Johnson made any physical advances. One night Rogers had attended a concert with Kostka, who left her stranded at the venue after they fought. Rogers, having no transportation home, began walking along the road and

3

called Johnson, who had attended the same concert with her family. Johnson picked her up from the side of the road, and Rogers got into the back seat with Johnson's adult daughter and other family members. Johnson drove Rogers to the home she shared with Kostka, where Rogers retrieved some belongings and placed them in her Animal Control truck, which was parked there. Johnson's family left in their car, and Johnson drove the truck with Rogers in the passenger seat. Rogers claims that she asked Johnson to take her to her mother's home, but that Johnson refused and would only take Rogers to her house. According to Johnson, she offered to take Rogers to her mother's house, but Rogers said she did not want her mother to know what had happened; Johnson then offered to let Rogers stay with her, and Rogers agreed.

Rogers alleges that, in the truck, Johnson asked her what had happened and told Rogers that she should not be with Kostka. Johnson also touched Rogers' leg and caressed her shoulder for about 20 seconds. Rogers, in response, told her she was uncomfortable and moved over. Johnson denies this, claiming that she was on the phone with her partner – and that Rogers was crying hysterically – during the entire ride. Once at her home, Johnson claims her 25-year-old daughter took care of Rogers, and Johnson did not see her again.

Rogers complained about the alleged harassment to her mother (Allison Garrett), Bennett, and Dolores Lackey, an Animal Control Officer III. According to Garrett, Rogers would call her while agitated and crying about invitations she had received from Johnson. Rogers told Bennett that certain encounters with Johnson and Hermann had made her uncomfortable. Lackey recalled that Rogers, before her termination, expressed concern that she would lose her job because she would not have a relationship with Johnson or Hermann. Johnson learned in June 2007 that Rogers and Kostka had resumed their relationship after having earlier broken up, and Rogers claims that Johnson's demeanor towards her immediately changed, becoming rude and stern.

In early 2007, Rogers' girlfriend Kostka held a "Passion Party," the purpose of which is to purchase sex toys. Rogers posted the invitation to the party on a bulletin board at

4

Animal Control, and extended an open invitation for her colleagues to attend the party.  None of her colleagues attended.

## II. Rogers' Performance on the Job

Although the standard training period for a probationary employee is four months, Rogers completed her training in less than two, which Hermann noted was faster than she had seen any other individual do so.  Rogers received a positive evaluation of her first six months of service, from September 2006 through March 2007.  Out of five categories of performance, she was rated "satisfactory" in three and "above average" in two.  The commentary on her evaluation noted that her workload was larger than normal, that she executed her tasks with the skills of a seasoned officer, and that staff and the public frequently complimented her work.  In the employee comments section of the evaluation, Rogers wrote, "Working here is a joy and I love and appreciate my job very much."  Lackey, who was responsible for reviewing Rogers' work, said that Rogers was considered a good officer: "She was compassionate.  She listened.  She knew the laws.  And so she knew how to enforce them."

According to Johnson, however, Rogers' performance severely declined in May 2007.  She claims that Rogers would arrive late to work and became lax in her paperwork; Johnson believes she spoke to Rogers about such minor deficiencies between 15 and 20 times starting in late May.  In July, Johnson asserts that Rogers seriously mishandled two calls – one to assist an injured dog, the other to investigate a vicious dog – which precipitated the termination of her probation.

At approximately 8:30pm on July 12, 2007, Rogers received a call at home from the Clearlake Police Department regarding an injured dog in need of attention.  Rogers called the phone number for Julie Burrow, a City of Clearlake employee who reported the incident, but no one answered.  Upon arriving at the site about an hour later, Rogers observed a dog in the road, which then stood quickly and ran off.  Unable to relocate the dog after driving around the vicinity, she returned home to find a message waiting from the police department.  She

5

returned the dispatcher's call and was given a new number for Burrow; after explaining to the dispatcher that she had been unable to find the dog, Rogers was told that the police department would send someone to the scene.

The next day, Burrow emailed a complaint regarding Animal Control's response to the incident. The dog, she explained, had slid down the hill on a construction site and was lodged in the back of a fence, a fact that Rogers had not known. Despite Burrow's repeated calls to the police department and Animal Control, an officer only arrived at 9:30am, more than 13 hours after she first reported the incident. Johnson, after investigating Rogers' handling of the call, concluded that she had acted inappropriately by failing to contact Burrow or the police department before leaving the scene, and by not offering to call Burrow's new number or return to the scene after receiving a second call from the police.

The second incident occurred on July 27, 2007, when Rogers responded to a call regarding two dogs that had killed 19 guinea hens. Rogers was told by dispatch that the reporting party had requested that only a warning be issued to the owner of the dogs, which is all Rogers did: she posted a notice of violation on a fence, but she did not enter the property due to a locked gate. Johnson contends that Rogers handled the call improperly for multiple reasons. Standard procedures for vicious animal reports required Rogers to perform a "vicious abatement" – where dogs are quarantined during an investigation of an incident – rather than simply leave a notice of violation. Rogers failed to photograph the animals killed, did not collect the bodies for evidence, did not secure the vicious animals, never called for a backup officer, and did not attempt to contact the dogs' owner.

Rogers, while aware that local ordinances require the performance of an abatement when an animal attacks another animal or livestock, claims that she could not do so because she did not have a witness to the incident. According to both Lackey and Bennett, it is not uncommon for officers not to take photographs in vicious dog cases when, for example, the reporting party declines to make a witness statement. Lackey also said that, absent exigent circumstances, officers are instructed not to enter private property without the owner's permission. Rogers asserts that her response was not extraordinary and did not violate

6

1 Animal Control's policies and procedures, as officers on numerous vicious animal calls have
2 failed to perform an abatement or capture an animal on the first attempt.

### III. Rogers' Termination and Sexual Harassment Complaint

On the morning of August 6, 2007, Johnson called Rogers into her office to discuss Rogers' handling of the two calls. Rogers perceived Johnson's reaction to be dismissive when she explained that her conduct was consistent with her training. Rogers, upset because she suspected that her job was in jeopardy, met her mother for lunch, during which she decided to submit a formal complaint about the alleged harassment. She picked up the harassment paperwork from human resources after lunch, but decided to wait until that evening to fill it out.

After receiving a radio call from Johnson instructing her to report to the office, Rogers returned and had a meeting with Johnson and a representative from human resources, Dawn Perata. Rogers was handed a piece of paper stating she had failed her probation and would be terminated, which Johnson instructed her to sign. Johnson told her to collect her belongings and leave. According to Johnson, she had previously consulted with human resources about Rogers' performance in July following the first episode with the injured dog. Although Johnson never discussed either call with Rogers before the morning meeting on August 6, she had communicated with Rogers about the first episode over email on July 17, 2007.

Lackey was surprised to learn that Rogers had been terminated, because she was a "good officer." Hermann said that she considers Rogers to be competent in handling incidents involving vicious animals.

Rogers filed her sexual harassment complaint with human resources the day after her termination. The county's human resources director, Kathy Ferguson, decided the allegations warranted investigation and hired a private investigator. Ferguson concluded, after consulting with Johnson, that Rogers' termination was justified. Based on the investigator's report, Ferguson found that Hermann had engaged in inappropriate conduct.

7

Hermann received a warning in her file and was required to re-take the county's online sexual harassment training. Ferguson, while deeming the allegations against Johnson to be unreasonable, found that Johnson failed to recognize Hermann's inappropriate conduct.

**LEGAL STANDARD**

Summary judgment is appropriate when there is no genuine dispute as to material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* The Court may not weigh the evidence and must view the evidence in the light most favorable to the nonmoving party. *Id.* at 255.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). However, on an issue for which its opponent will have the burden of proof at trial, the moving party can prevail merely by "pointing out . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If the moving party meets its initial burden, the opposing party must then "set out specific facts showing a genuine issue for trial" to defeat the motion. Fed. R. Civ. P. 56(e)(2); *Anderson*, 477 U.S. at 256.

**DISCUSSION**

Rogers brings four claims for discrimination and harassment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and California's Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12940, as well as a fifth claim for wrongful

8

discharge in violation of public policy.[2] Title VII provides that it "shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2. FEHA imposes a similar proscription. Cal. Gov't Code § 12940(a) (making it an "unlawful employment practice" to discriminate against any person "in compensation or in terms, conditions, or privileges of employment" because of sex). Sexual harassment violates both Title VII and FEHA. *Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1065 (9th Cir. 2002) (Title VII); Cal. Gov't Code § 12940(j)(1) (FEHA). As "California courts apply the Title VII framework to claims brought under FEHA," *Metoyer v. Chassman*, 504 F.3d 919, 941 (9th Cir. 2007), this Court will assess the federal and state causes of action together.

Rogers alleges that her termination constituted discrimination on the basis of gender, and advances a hostile work environment theory for her harassment claims. She also brings a claim for wrongful termination in violation of public policy. Defendants move for summary judgment on all claims. The Court will consider each claim in turn.

## I. Discrimination

The parties agree that Plaintiff's discrimination claims are properly analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The *McDonnell Douglas* test, which applies when discrimination cases are based on circumstantial evidence, sets forth "successive steps of increasingly narrow focus" that allow "discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained." *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 354 (2000). The first step is for Plaintiff to make a prima facie showing of discrimination, by providing evidence that (1) she was a member of a protected class, (2) she was performing competently, (3) she suffered an adverse employment action, such as termination or

---

[2] By stipulation of the parties, Johnson and Hermann have been dismissed as defendants in all causes of action except the FEHA sexual harassment claim.

demotion, and (4) some other circumstance suggests discriminatory motive. *Id.* at 355. The prima facie case, once established, creates a presumption of discrimination, which Defendants must rebut by presenting evidence of "a legitimate reason for the action" that is "legally sufficient to justify a judgment for the defendant." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981).

The burden then shifts back to Plaintiff, who must "demonstrate that the proffered reason was not the true reason for the employment decision" in order to sustain her "ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Id.* at 256. "She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* "Where the evidence of pretext is circumstantial, rather than direct, the plaintiff must present 'specific' and 'substantial' facts showing that there is a genuine issue for trial. However, that requirement is tempered by our observation that, in the context of Title VII claims, the burden on plaintiffs to raise a triable issue of fact as to pretext is 'hardly an onerous one.'" *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1170 (9th Cir. 2007) (internal citations omitted).

The first step is for Rogers to establish a prima facie case of discrimination. She is a member of a protected class based on her gender, and suffered an adverse employment action in the form of termination. Although Defendants allege that Rogers' performance declined during her last months of employment, Rogers has put the question of her competence in dispute by offering evidence of her positive evaluation in March and assessments by colleagues that she excelled compared to other probationary employees. Finally, Rogers was on the receiving end of sexually explicit conversation, questions about her personal life, and invitations to her supervisor's home, which she construed as sexual advances to which she would not accede. Such circumstances are sufficient at least to suggest a discriminatory motive in Rogers' firing. Construing the disputed facts in Rogers' favor, the Court finds that she has made out a prima facie case.

1    Defendants have also sustained their burden of advancing a legitimate
2 nondiscriminatory reason for Rogers' termination.  Defendants have presented evidence that
3 Rogers seriously mishandled two calls, having failed to rescue an injured dog or to properly
4 investigate an attack by vicious dogs.  Johnson characterized both episodes as serious
5 infractions, and they together appear to justify the decision to conclude that Rogers had failed
6 her probation.
7    The burden of persuasion therefore moves back to Rogers and merges with her
8 ultimate burden of proof.  The determination at this final stage hinges on which of the
9 accounts – the discriminatory theory advanced by Rogers, or the legitimate rationale
10 presented by Defendants – more likely explains Rogers' termination.  The facts on which this
11 conclusion rests are heavily disputed by the parties.  Johnson states that Rogers violated
12 Animal Control procedures in her response to the calls, while Rogers asserts that her conduct
13 comported with her training and the behavior of more experienced officers in the field.  The
14 parties also disagree about the frequency, content, and context of episodes that Rogers cites
15 as the basis for her claim of discrimination.  Rogers has raised "a triable issue of fact that the
16 defendant[s'] proffered reason was a pretext for unlawful discrimination." *Noyes*, 488 F.3d
17 at 1168.  Defendants' motion for summary judgment as to the discrimination claims under
18 Title VII and FEHA is therefore DENIED, and Plaintiff's first and third causes of action
19 survive.

21 **II.   Harassment**
22    Rogers premises her sexual harassment claims on a hostile work environment theory.
23 "A 'hostile work environment' occurs when there is a pattern of ongoing and persistent
24 harassment severe enough to alter the conditions of employment." *Draper v. Coeur*
25 *Rochester*, 147 F.3d 1104, 1108 (9th Cir. 1998).  Claims of sex-based workplace harassment
26 are cognizable under Title VII even "when the harasser and the harassed employee are of the
27 same sex." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 76, 82 (1998).  "California
28 courts have adopted the [Title VII] standard for hostile work environment sexual harassment

11

claims under the FEHA." *Lyle v. Warner Bros. Television Prods.*, 38 Cal. 4th 264, 279 (2006).

To establish a prima facie case of a hostile work environment, a plaintiff must show that "(1) she was subjected to verbal or physical conduct of a sexual nature, (2) this conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Craig v. M&O Agencies, Inc.*, 496 F.3d 1047, 1054-55 (9th Cir. 2007). The working environment must be considered abusive from both an objective and a subjective perspective. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993). Not only must the victim "subjectively perceive the environment to be abusive," *id.*, but a hypothetical "reasonable person with the same characteristics as the victim" would have to agree, in light of "the totality of the circumstances," *Craig*, 496 F.3d at 1055. "To determine whether conduct was sufficiently severe or pervasive to violate Title VII, we look at 'all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003) (quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001)).

The Supreme Court has counseled that the inquiry into "the objective severity of harassment . . . requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale*, 523 U.S. at 81.

> The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

*Id.* at 81-82. Title VII is not "general civility code," and its standards are designed to "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use

12

of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citations omitted).

Defendants contend that Rogers' complaints fall into the category of ordinary workplace tribulations. Defendants acknowledge that Hermann "engaged in unwelcome oversharing and may have lacked appropriate boundaries," and that her photograph was "inappropriate to show at work." Defs.' Reply at 5. They contend, however, that Hermann's actions cannot be reasonably construed as sexual advances. Defendants also admit that Johnson encouraged Rogers to leave her girlfriend and told her she was welcome at Johnson's house, but argue that neither can be perceived as sexual. Defendants stress that Johnson's alleged physical contact with Rogers lasted only seconds, and assert that no evidence shows the contact was anything but an attempt to comfort a distraught employee. Defendants also cite Rogers' invitation of her colleagues to the "Passion Party" as evidence that she did not subjectively perceive her working environment to be abusive.

The evidence supports Rogers' claim that she was subjected to conduct of a sexual nature by both Hermann and Johnson, and that it was unwelcome. Hermann explicitly discussed her sexual activities with Rogers, invited Rogers to join her on a trip that she had described in sexual terms, and showed off a nude photograph of herself. Although Johnson's conduct was less explicit, she repeatedly asked Rogers about her relationship, encouraged her to end that relationship, invited Rogers to her home, and – on one occasion – caressed Rogers on the leg and shoulder. Rogers found the conduct of both Hermann and Johnson unwelcome, a sentiment she expressed to her mother and colleagues at Animal Control before her termination.

The more difficult question is whether the severity of the conduct is sufficient to make out a cognizable claim for sexual harassment. "[M]ere isolated incidents or offhand comments . . . do not amount to a Title VII claim," while "serious and pervasive harassment . . . clearly comes within Title VII." *Craig*, 496 F.3d at 1056. Rogers' allegations fall somewhere between those extremes. The behavior of which she complains was too frequent to be considered isolated or offhand. Furthermore, both Johnson's and Hermann's conduct

13

must be examined in light of their positions: Johnson as Rogers' direct supervisor, and Hermann as her principal trainer. Where one's harasser is her "immediate boss," the harasser's actions may be even more "emotionally and psychologically threatening" than they would otherwise be. *Id.* Even "[w]ell-intentioned compliments by co-workers or supervisors can form the basis of a sexual harassment cause of action if a reasonable victim of the same sex as the plaintiff would consider the comments sufficiently severe or pervasive to alter a condition of employment and create an abusive working environment." *Ellison v. Brady*, 924 F.2d 872, 880 (9th Cir. 1991). In *Ellison*, the Ninth Circuit concluded that the plaintiff who had received two "bizarre," "passionate," and "disturbing" love letters from a colleague she barely knew had made out a prima facie case for sexual harassment. *Id.* at 880-81. Emphasizing that it could not "say as a matter of law that [the plaintiff's] reaction was idiosyncratic or hyper-sensitive," the court concluded "that a reasonable woman could have had a similar reaction." *Id.* at 880.

Whether a reasonable person would perceive the conduct of Johnson and Hermann to create an abusive working environment is a question this Court cannot answer on the record of disputed facts before it. "In close cases . . . where the severity of frequent abuse is questionable, it is more appropriate to leave the assessment to the fact-finder than for the court to decide the case on summary judgment." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1096 (9th Cir. 2008). Although it is unclear whether Rogers' claim "will ultimately persuade the trier of fact," she has "alleged sufficient facts to state a prima facie case" when "viewing the facts in the record in the light most favorable to the non-moving party." *Craig*, 496 F.3d at 1057. Her claims of harassment under Title VII and FEHA therefore survive summary judgment, and Defendants' motion is DENIED with respect to the second and fourth causes of action.[3]

---

[3] Lake County raises the affirmative defense that Rogers unreasonably failed to take advantage of its sexual harassment procedures. However, such a defense is not available "when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998). Since Rogers was terminated, the Court does not consider Lake County's affirmative defense on this motion.

14

### III. Termination in Violation of Public Policy

Rogers' fifth and final cause of action is for wrongful termination in violation of public policy. California law allows a discharged employee to "maintain a tort action and recover damages traditionally available in such actions" when an employer's discharge of that employee "violates fundamental principles of public policy." *Tameny v. Atlantic Richfield Co.*, 27 Cal. 3d 167, 170 (1980). Defendants argue that Lake County – the only defendant against whom this claim is asserted – cannot be subject to tort liability because it is a public entity. Plaintiff does not address this argument in her opposition.

Section 815(a) of the California Government Code declares that – "[e]xcept as otherwise provided by statute" – a "public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." The California Supreme Court has held that "section 815 abolishes common law tort liability for public entities," and that it specifically "bars *Tameny* actions against public entities." *Miklosy v. Regents of Univ. of Cal.*, 44 Cal. 4th 876, 899-900 (2008). Plaintiff does not contest, and thus appears to concede, this point. Summary judgment is therefore GRANTED to Defendants as to Rogers' fifth cause of action for wrongful termination in violation of public policy, which is DISMISSED.

### CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED as to Plaintiff's fifth cause of action, and DENIED as to the four claims for discrimination and harassment under state and federal law.

**IT IS SO ORDERED.**

Dated: 4/26/10

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT